[Cite as *In re S.D.*, 2012-Ohio-2299.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 97322

---

# IN RE: S.D., JR.

# A MINOR CHILD

# [APPEAL BY R.D., PATERNAL GRANDMOTHER]

---

## JUDGMENT:
## AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Court Division
Case No. AD 10907624

**BEFORE:**    Kilbane, J., Blackmon, A.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:**    May 24, 2012

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1350 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEES**

**FOR CCDCFS**

William D. Mason
Cuyahoga County Prosecutor
Gregory S. Millas
Assistant County Prosecutor
CCDCFS
8111 Quincy Avenue, Room 444
Cleveland, Ohio 44104

**GUARDIAN AD LITEM FOR MINOR CHILD**

Beth Judge
17 South Main Street
Suite 201
Akron, Ohio 44308

**FOR FATHER**

Kimberly A. Showalter
28522 West Oviatt Road
Bay Village, Ohio 44140

MARY EILEEN KILBANE, J.:

{¶1} Appellant, R.D., paternal grandmother of S.D. (referred to herein as "paternal grandmother"), appeals from the order of the juvenile court that awarded permanent custody of S.D. to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). For the reasons set forth below, we affirm.

{¶2} S.D. was born on May 19, 2009, while his mother, L.S., was incarcerated for probation violations on drug-related charges. On March 23, 2010, following a bifurcated hearing on the issues of neglect and dependency, S.D. was determined to be neglected and dependent, and his father was awarded legal custody. The record indicates that the child was placed in foster care but had extended visits with the father, who was residing with appellant. Approximately one month later, both parents were subsequently arrested for aggravated murder and other offenses in connection with the death of Angel Bradley-Crockett.

{¶3} The trial court subsequently vacated father's award of legal custody, and on April 29, 2010, while both parents were incarcerated, CCDCFS filed a complaint for permanent custody of S.D. By this date, CCDCFS had learned that the father had an extensive history of juvenile adjudications that had not been disclosed to the agency in their investigations with regard to S.D. Specifically, the father's adjudications included gross sexual imposition, aggravated murder, and abuse of a corpse.

**{¶4}** On May 5, 2010, the trial court awarded temporary emergency custody of S.D. to CCDCFS.

**{¶5}** The matter proceeded to an adjudicatory hearing on July 20, 2010. At this time, the father and mother admitted various allegations in the county's complaint for permanent custody, including the allegations that they are presently incarcerated and do not have custody of their other children. In addition, social worker, Dharma Arki ("Arki"), also testified regarding the father's acts of domestic violence against the mother, "intimidating" "nonverbal communication" from the father to the mother, and the mother's recantation of a prior domestic violence complaint against the father. At this time, in a highly unusual and alarming pronouncement, the trial court record states:

> It's kind of developing this weird dynamic in this courtroom, I have to tell you. You know I'm uncomfortable with it. I want the record to reflect that, the Court itself is a little nervous.

**{¶6}** Following this hearing, the trial court found by clear and convincing evidence that S.D. is a neglected child, and foster parents subsequently took custody of S.D.

**{¶7}** Paternal grandmother notified the trial court that she was seeking legal custody of S.D. On September 7, 2010, S.D.'s guardian ad litem, Beth Judge ("the GAL"), filed a report. As is relevant herein, in addition to the charges involving Bradley-Crockett and the juvenile adjudications, the GAL noted that father was "facing a federal parole revocation hearing," which was scheduled to occur on the day after he was granted legal custody of the minor child. The GAL additionally reported:

[Paternal grandmother] has a history of domestic violence charges. Overall, there are concerns about [paternal grandmother's] criminal background, her financial stability, her cooperation with this GAL, with CCDCFS, as well as her impending testimony in [the father's] impending criminal trial. CCDCFS has excluded [paternal grandmother] as an appropriate caregiver. For these reasons, [paternal grandmother] is not an appropriate caregiver for S.D. and should not be considered for legal custody.

{¶8} The GAL then averred that two unidentified witnesses received letters from the paternal grandmother's family telling them not to cooperate with any investigation. The GAL recommended that permanent custody be granted to the CCDCFS. The matter proceeded to a dispositional hearing that began on December 16, 2010. CCDCFS maintained that it had investigated the paternal grandmother, and it was determined that it was in the child's best interest to be in the permanent custody of CCDCFS.

{¶9} Arki testified that she began a dual home study to investigate paternal grandmother and S.D.'s father in connection with this matter. Prior to completing the study, however, paternal grandmother informed Arki that "she wanted to pull her name out and let [J.D.] be the care giver[.]" J.D. is the paternal aunt of S.D.

{¶10} Arki further testified that on the 2009 "Non-Conviction Statement" of the caregiver approval packet, the family was required to indicate whether the individual seeking custody has been convicted of an offense, identify the offense, and sign the form. In this matter, the father indicated that he had been convicted of a drug offense, but did not disclose that he had been adjudicated for aggravated murder and other offenses. No other family members who signed the packet mentioned this information.

{¶11} Arki admitted on cross-examination that her 2009 investigations into paternal grandmother's suitability for custody revealed no concerns about her background, no concerns about her behavior with the child, and no concerns about her home.

{¶12} CCDCFS senior supervisor, Veronica Holloway ("Holloway"), testified that on March 23, 2010, the father was awarded legal custody of S.D., pending the results of the fingerprint analysis. According to Holloway, the father was specifically asked about his juvenile record in the presence of paternal grandmother and J.D., and he mentioned only the drug-related matter. Neither paternal grandmother nor J.D. mentioned his prior juvenile adjudication for aggravated murder.

{¶13} Holloway further testified on April 11, 2010, that paternal grandmother stated in a case management meeting that the father was at her home at the time of the murder of Angel Bradley- Crockett, and J.D. also stated that the father was "innocent" in that matter. Holloway subsequently concluded that the child had to be removed from paternal grandmother's home. Holloway acknowledged, however, that in 1993, a report of abuse in paternal grandmother's home was deemed "substantiated,"[1] but a child living with her at that time was not removed from paternal grandmother's care following the agency's investigation.

---

[1] The record suggests that this matter relates to paternal grandmother's arrest for domestic violence that involved a former boyfriend.

**{¶14}** Social worker, Kate McBride ("McBride"), testified that, although CCDCFS excluded the paternal relatives from taking custody of the child, they could still pursue custody through the agency's foster recruitment division. Paternal grandmother did not pursue the matter through that division.

**{¶15}** McBride admitted on cross-examination that S.D. appeared to enjoy being with paternal grandmother during a visit at CCDCFS, and he has experienced "night terrors" in foster care. However, the evidence indicated that this is not abnormal in light of the custody background.

**{¶16}** The family presented various witnesses. Hope Academy teachers Rebecca Middea and Stephanie Talty testified that J.D. is very involved in her daughter's education, interacts appropriately with children, and has a good character. These witnesses admitted, however, that they have never seen J.D. with S.D., and that they have no information about the county's involvement in this matter.

**{¶17}** Christopher McKinley ("McKinley"), Arki's supervisor, testified that he reviewed CCDCFS's activity logs in this matter and was aware of the father's juvenile record, but not all of the details of that record. McKinley stated that he asked the father for more information about the juvenile adjudications but he refused to provide it. McKinley consented to the father having custody of S.D. because, under CCDCFS guidelines, offenses ten years old or older do not disqualify a parent from being a caregiver. He acknowledged, however, that CCDCFS Director, Debra Forkas, has authority over such issues.

**{¶18}** On cross-examination, McKinley admitted that under CCDCFS governing rules, an aggravated murder adjudication cannot be rehabilitated and that, based upon incomplete information, CCDCFS mistakenly awarded legal custody of S.D. to the father in March 2010. As to the delay in removing the child from the paternal grandmother's home following the father's arrest, McKinley stated that the CCDCFS was attempting to obtain additional information.

**{¶19}** Paternal grandmother testified that she was seeking legal custody of S.D., despite her earlier request to be withdrawn from consideration. She stated that she hoped to continue the care she had been providing while the father had legal custody of the child. She stated that she has been at the same job for the past ten years, has the means to take care of him, and that her home has already been deemed an appropriate location. She stated that she has no mental health, drug, or alcohol issues, and she described a loving and affectionate relationship between S.D. and other members of her family.

**{¶20}** Paternal grandmother further testified that she discussed the father's juvenile adjudications with Arki and did not conceal any information. She also denied providing an alibi for the father in the Bradley-Crockett criminal proceedings, but she insisted that the father was in her home when that incident took place, and that she intended to testify at that trial.

**{¶21}** The GAL elected to present evidence. She testified that during her meetings with the father, and in the presence of paternal grandmother, she asked the father about his criminal convictions, and neither he nor paternal grandmother mentioned

the juvenile adjudications. The GAL explained that there had a been a delay in obtaining the father's fingerprints in this matter, and based upon incomplete information provided, including the "Non-Conviction Statement," the GAL recommended that the father be awarded legal custody with court-ordered supervision. The GAL stated that she had made independent efforts to ascertain the father's complete criminal background, but the juvenile adjudication was not accessible to her, apparently due to a prior federal court order.

{¶22} The GAL additionally testified that she has listened to recorded telephone conversations between the father, paternal grandmother, and J.D. In these calls, the father instructed them to call the municipal jail where the mother was being held and tell police officials that they were the mother's legal counsel, speak with the mother, and warn her "not to talk to the homicide detectives."

{¶23} On March 2, 2011, the mother appeared before the court pursuant to Juv.R. 29 and admitted that it is in the best interest of S.D. for permanent custody to be awarded to the CCDCFS.

{¶24} On May 10, 2011, the foster family notified the trial court that they had received a call, purportedly from the Cleveland Clinic, requesting that the child be brought in for an appointment on the following Friday. The foster family became suspicious, and when they contacted the Cleveland Clinic, they learned that no appointment for him was scheduled. However, Cleveland Clinic police made no arrests in connection with this incident.

**{¶25}** On June 3, 2011, the GAL filed a closing argument in which she noted that paternal grandmother formally withdrew herself from consideration with CCDCFS as a potential caregiver for the minor child. The GAL additionally provided in relevant part as follows:

> 5. Paternal relatives [paternal grandmother] and J.D. concealed [the father's] extensive criminal record including his aggravated murder, abuse of a human corpse[,] and gross sexual imposition adjudications.
>
> * * *
>
> 8. [CCDCFS] Chief Holloway testified that had she known the full extent of [the father's] criminal history she would not have approved his petition for custody.
>
> * * *
>
> 10. Supervisor McKinley testified that approving [the father's] request for legal custody was a mistake.
>
> * * *
>
> 12. [The father] was residing with his mother * * * when he failed the February 2010 urine screen and was facing revocation of his federal parole.
>
> * * *
>
> 15. [Paternal grandmother] was also present during the GAL home visit wherein she also chose to remain silent during questions posed by this GAL regarding the father's criminal background, thus failing to correct the record concerning untruthful information provided by the father
>
> 16. [Paternal grandmother] intends upon testifying as a material witness in the capital murder case and providing her son * * * with an alibi.

17. The GAL testified that she has listened to recorded telephone conversations between [the father,] [paternal grandmother] and J.D. wherein [the father] instructed [paternal grandmother and J.D.] to call the municipal jail when [the mother] was arrested and tell police officials that they were [the mother's] legal counsel and to gain access to [the mother] and warn her "not to talk to the homicide detectives." In a separate telephone conversation, J.D. expressed that she completed the task and called the jail.

* * *

20. * * * [The mother] has also confided that she is afraid that the minor child will be used as leverage by the paternal relatives in the underlying criminal trial.

**{¶26}** In closing, to further support the GAL's findings justifying her decision in favor of permanent custody, she stated that "[t]he Agency needs to trust relatives requesting placement and there is no trust in this case," an important, intangible quality when deciding placement of a child.

**{¶27}** In opposition, paternal grandmother submitted a closing argument in which she reiterated that she is interested in obtaining legal custody of S.D. She also maintained that her home has previously been deemed an appropriate placement for him, that she is capable of providing for S.D.'s needs, and will provide a caring and loving placement.

**{¶28}** For its closing argument, CCDCFS maintained that the paternal relatives elevated their loyalty to the father over their concern for S.D., and that permanent custody should be awarded to CCDCFS.

**{¶29}** On August 15, 2011, the trial court awarded permanent custody of S.D. to CCDCFS and noted:

> The Court is concerned about the safety of the child with the biological family.
>
> The Court finds that the child's continued residence in or return to the home would be contrary to the child's best interest and welfare. The Court finds that, in accordance with Division (D)(1) of R.C. 2151.414, permanent custody is in the child's best interest. In reaching this decision, the Court considered the following * * *[:]
>
> The GAL for the child recommends a grant of permanent custody as being in the child's best interest.
>
> [T]he facts and arguments laid out in the written closing arguments of CCDCFS and the GAL to be well taken. Given the particular facts of this case, the Court finds that it is not in the child's best interest that the parents have residual rights in this matter as they would if legal custody were granted to the paternal relatives. See *In re Awkal* (1994), 95 Ohio App.3d 309, 315, 642 N.E.2d 424.
>
> The Court also finds compelling the decision of the mother to change her plea and to stipulate that permanent custody is in her son's best interest rather than the motion for legal custody of the paternal relatives.
>
> [T]he motions for legal custody to paternal relatives are not in the child's best interest and are therefore denied. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532.
>
> This has been a difficult case because of the pall of violence that has loomed over this entire matter. The Court finds that the only safe, legally secure placement for this child is one away from the biological family. The Court further finds that the only way of accomplishing this outcome is by granting permanent custody to CCDCFS so that he may be placed for adoption.

**{¶30}** Paternal grandmother now appeals, assigning two errors for our review.

**{¶31}** For her first assignment of error, paternal grandmother asserts that the judgment of the trial court is contrary to the manifest weight of the evidence.

Permanent Custody Motion

**{¶32}** The discretion that a trial court enjoys in custody matters should be afforded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *In re A.D.*, 8th Dist. No. 85648, 2005-Ohio-5441, ¶ 6. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. *Id.*

**{¶33}** Before a juvenile court may terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test that (1) the child is abandoned, orphaned, had been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child could not be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D).

**{¶34}** As explained in *In re E.M.*, 8th Dist. No. 79249, 2001 WL 1400022, (Nov. 8, 2001), ¶ 38:

> Clear and convincing evidence is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of

such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." A determination of whether something has been proven by clear and convincing evidence will not be disturbed on appeal unless such determination is against the manifest weight of the evidence. If a burden of proof must be met with clear and convincing evidence, a reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy that burden of proof. (Internal citation omitted.)

*Accord In re M.H.*, 8th Dist. No. 80620, 2002-Ohio-2968, ¶ 22.

**{¶35}** In applying the manifest weight standard of review, our role is to determine whether there is relevant, competent and credible evidence upon which a factfinder could base its judgment. *In re M.W.*, 8th Dist. No. 96817, 2011-Ohio-6444. Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *In re M.W.*; *In re P.R.*, 8th Dist. No. 76909, 2002-Ohio-2029, ¶ 15.

<u>Best Interest Factors</u>

**{¶36}** In this matter, there is no dispute that S.D. cannot be placed with his parents, therefore, we proceed to the second portion of the R.C. 2151.414 analysis. When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the

maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]   R.C. 2151.414(D)(1).

{¶37} This court has "consistently held that only one of the factors set forth in R.C. 2151.414(D) needs to be resolved in favor of the award of permanent custody in order for the court to terminate parental rights."   *In re Z.T.*, 8th Dist. No. 88009, 2007-Ohio-827, ¶ 56; *In re L.S.*, 8th Dist. No. 95809, 2011-Ohio-3836, ¶ 15.

{¶38} In the instant case, the trial court observed the witnesses directly and gained first-hand knowledge of their interactions.   In an adjudicatory hearing on July 20, 2010, the court stated on the record:

It's kind of developing this weird dynamic in this courtroom, I have to tell you.   You know I'm uncomfortable with it.   I want the record to reflect that, the Court itself is a little nervous.

{¶39} At the close of all of the proceedings, the court stated in its journal entry that it had considered all the relevant factors pursuant to R.C. 2151.414(D) in determining the best interest of the child.   The record shows that the child had been in CCDCFS for almost his entire life.   Although S.D. could not express his own desires, he is entitled to stability and a legally secure placement, and the trial court further found that this could

only be achieved through permanent custody. In light of all the evidence, the trial court properly found that permanent custody was in the child's best interest.

## Other Family Members

{¶40} As to paternal grandmother's contention that CCDCFS did not adequately pursue the issue of granting her legal custody of S.D., we note an award of legal custody does not constitute a "termination of all residual parental rights, privileges, and responsibilities," so the parent and the agency have the option in the future to seek a change of custody. *See* R.C. 2151.353(E)(2); *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 17.

{¶41} Moreover, the juvenile court is not required to determine by clear and convincing evidence that "termination of appellant's parental rights was not only a necessary option, but also the only option" or that "no suitable relative was available for placement." *In re Schaeffer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64. The *Schaeffer* court stated:

> The statute requires a weighing of all the relevant factors, and the trial court did that in this case. R.C. 2151.414 requires the court to find the best option for the child once a determination has been made pursuant to R.C. 2151.414(B)(1)(a) through (d). The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors.

**{¶42}** In addition, this court has repeatedly held that the trial court is not required to consider placing children with a relative prior to granting permanent custody to CCDCFS, and the willingness of a relative to care for a child does not alter what the court must consider in determining permanent custody. *In re L.S.*, citing *In re Benavides*, 8th Dist. No. 78204, 2001 WL 470177 (May 3, 2001); *In re Patterson*, 134 Ohio App.3d 119, 730 N.E.2d 439 (9th Dist.1999); *In re A.D.*, 8th Dist. No. 85648, 2005-Ohio-5441, ¶ 12. As explained in *In re A.D.*:

> [A]lthough the court must find by clear and convincing evidence that the parents are not suitable placement options, the court is not required to invoke the same standard with regard to a grandparent.

**{¶43}** As to whether S.D.'s need for a legally secure permanent placement could be obtained without a grant of permanent custody to the agency, we note, as an initial matter, that during a portion of the proceedings below, paternal grandmother stated that she did not want to be considered for placement, and deferred instead to J.D. and/or Adriane Phillips. None of the family members completed the requirements for becoming foster parents, despite being informed by the county that this was a prerequisite for having legal custody of the child. Significantly, the court expressed concern for the child's safety with the biological family and also found compelling "the decision of the mother to change her plea and to stipulate that permanent custody is in her son's best interest rather than the motion for legal custody of the paternal relatives."

**{¶44}** In addition, it is axiomatic that the court and the CCDCFS must be able to repose trust in the individual seeking custody. Here, however, the record contains

compelling evidence that paternal grandmother said nothing of the father's juvenile record, which contains adjudications for aggravated murder, abuse of a corpse, and gross sexual imposition, during numerous instances where the CCDCFS and the GAL were investigating paternal grandmother's home in connection with the award of legal custody to the father. Further, although the family reported the drug-related conviction, they failed to disclose the father's current revocation of federal parole.

{¶45} In addition, Holloway's testimony further established that paternal grandmother stated, immediately following the father's arrest and before full information about the Bradley-Crockett murder was established, that the father was in her home during the time of that murder. The GAL testified that the father requested that paternal grandmother contact the mother and communicate with her in connection with the murder charges.

{¶46} Paternal grandmother's history, including a domestic violence conviction and prior loss of custody in connection with a fire caused by a child, apparently do not disqualify her from obtaining legal custody of S.D. This information is entitled to some weight, however, in determining whether she can provide a safe and legally secure placement for the child.

{¶47} Finally, the trial court properly noted that if it had granted legal custody of S.D. to paternal grandmother, then the parents would have residual rights to seek a change of custody. *See* R.C. 2151.353(E)(2); *In re Awkal*. The evidence overwhelming indicates that this outcome is not in the child's best interest. The trial court held, "[t]his

has been a difficult case because of the pall of violence that has loomed over this entire matter. The Court finds that the only safe, legally secure placement for this child is one away from his biological family."

**{¶48}** In accordance with all of the foregoing, a review of the evidence supports the trial court's rejection of paternal grandmother's claim for legal custody of S.D. and award of permanent custody to CCDCFS. The evidence indicated that the father's relatives put their concern for the father above their concern with providing the court and CCDCFS with complete and truthful information about the father, and that the undisclosed information has a direct bearing on the safety of the child. The evidence fully supports the trial court's conclusion that paternal grandmother is not a suitable custodian for the child and that permanent custody should be awarded to the CCDCFS. The judgment of the trial court is supported by clear and convincing evidence and is not against the manifest weight of the evidence. The first assignment of error is overruled.

**{¶49}** In the second assignment of error, the paternal grandmother complains that the trial court erred in admitting and relying upon the guardian ad litem reports that contained hearsay information.

**{¶50}** Pursuant to Juv.R. 34(I), the Rules of Evidence "shall apply" in hearings on motions for permanent custody. Nonetheless, the admission of evidence lies within the broad discretion of the trial court. *In re M.B.*, 8th Dist. No. 96724, 2011-Ohio-4645. A reviewing court will uphold an evidentiary decision absent an abuse of discretion that has

affected the substantial rights of the adverse party or is inconsistent with substantial justice. *Id.*

{¶51} Ohio courts have held that a trial court may consider the report of a court-appointed investigator despite the hearsay inherent in such a report. *In re A.L.*, 6th Dist. No. L-10-1355, 2011-Ohio-2569. To protect the parties' due process rights, however, the trial court must make the guardian ad litem available for direct and cross-examination. *Id.*

{¶52} In this matter, the GAL testified herein and was cross-examined by the parties. Paternal grandmother complains that the GAL was permitted to testify that paternal grandmother was going to be an alibi witness for the father and that her boyfriend provided employment records for the father. Because paternal grandmother testified directly as to these issues, we find no prejudicial error.

{¶53} Paternal grandmother next complains that the GAL introduced hearsay evidence that the father prevented her from speaking with the mitigation expert in his criminal trial. We note, however, that this evidence was offered to illustrate the nature of the GAL's investigation herein. *State v. Braxton*, 102 Ohio App.3d 28, 656 N.E.2d 970 (8th Dist.1995).

{¶54} Paternal grandmother also complains that the GAL testified to out-of-court jail recordings from the father to his family regarding efforts at contacting the mother. The calls were clearly business records of the jail and the father's and paternal

grandmother's statements are admissible as nonhearsay statements offered against a party pursuant to Evid.R. 801(d)(2)(A).

{¶55} Next, paternal grandmother complains that the GAL also testified to out-of-court statements from the mother that the father's family knew that he sold drugs and that unidentified witnesses had received threatening letters from his family. This evidence, though improper, did not prejudice the substantial rights of the parties as it clearly involved speculation.

{¶56} Moreover, we find no substantial prejudice in light of the great weight of other evidence supporting the trial court's ruling.

{¶57} The second assignment of error is overruled.

{¶58} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

PATRICIA A. BLACKMON, A.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR