[Cite as *In re H.A.*, 2020-Ohio-2945.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE H.A.                                    :
                                              :        No. 109002
A Minor Child                                 :
                                              :
[Appeal by F.S., Father]                      :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 14, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-16916259

---

### *Appearances:*

The Law Offices of Eric L. Foster, L.L.C., and Eric L.
Foster, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Laura M. Brewster, Assistant Prosecuting
Attorney, *for appellee.*

FRANK D. CELEBREZZE, JR., J.:

{¶ 1} Defendant-appellant, F.S. (hereinafter "Father"), brings the instant appeal challenging the trial court's judgment granting permanent custody of minor child H.A. to plaintiff-appellee, Cuyahoga County Division of Child and Family Services ("CCDCFS"). Father argues that the trial court's determination that

permanent custody was in the child's best interest is against the manifest weight of the evidence. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 2} The instant matter pertains to the trial court's custody determination with respect to minor child, H.A., born on December 23, 2012. As noted above, appellant is the child's father. Father is currently incarcerated for involuntary manslaughter in relation to the death of the child's mother, R.D. (hereinafter "Mother").

{¶ 3} On November 4, 2016, CCDCFS filed a complaint alleging that H.A. was a dependent child and requesting an order of predispositional temporary custody. At the time the agency filed its complaint, Mother had been missing for approximately three weeks and Father had been taken into custody for violating a protection order that prohibited him from having contact with Mother or H.A.

{¶ 4} While Father was incarcerated for violating the protection order, H.A. was residing with friends of Mother.[1] When Father was released from jail, and despite the fact the protection order prohibited him from having contact with H.A., Father removed the child from the friends' custody.

---

[1] CCDCFS case worker Corey Carlo testified that the agency was told that the individuals with whom the child was placed were maternal cousins, but the agency subsequently learned that the individuals were Mother's friends. Carlo confirmed that this placement was appropriate for the child, notwithstanding this discrepancy. (Tr. 17.)

{¶ 5} On November 9, 2016, CCDCFS obtained ex parte order to remove the child from Father's custody. The following day, the trial court granted emergency, predispositional temporary custody of the child to CCDCFS.

{¶ 6} On May 16, 2017, the trial court adjudicated H.A. a dependent child and placed the child in the temporary custody of CCDCFS. The trial court's determination was based on Father's admission to violating the protection order prohibiting him from having contact with Mother and H.A., and the fact that Father was in jail at the time for violating the protection order. At the time H.A. was placed in the temporary custody of CCDCFS, Mother was still missing.

{¶ 7} On May 18, 2017, Father was indicted in relation to Mother's death.

{¶ 8} On September 8, 2017, CCDCFS filed a motion to modify temporary custody to permanent custody. In January 2018, before the trial court ruled on CCDCFS's motion to modify, Father was convicted of (1) kidnapping H.A., and (2) involuntary manslaughter for his involvement in Mother's death. Father was sentenced to a prison term of 25 years. The protection order prohibiting Father from having contact with H.A. remains in effect and does not expire until February 2021.

{¶ 9} On December 27, 2018, Father filed a motion requesting that H.A. be placed in the legal custody of paternal relatives, M.A.S. and H.J.A.J. The paternal relatives reside in Louisville, Kentucky.

{¶ 10} Trial on CCDCFS's motion to modify and Father's motion for legal custody commenced on April 5, 2019, and, after a continuance, concluded on August 2, 2019. The following parties testified at trial: (1) CCDCFS case worker

Corey Carlo; (2) CCDCFS case worker Dershawnia Ganous, (3) M.A.S., (4) H.J.A.J., and (5) the child's guardian ad litem ("GAL").

{¶ 11} On August 22, 2019, the trial court denied Father's motion for legal custody and granted permanent custody of H.A. to CCDCFS. On September 13, 2019, Father filed the instant appeal challenging the trial court's judgment granting permanent custody to CCDCFS. Father assigns one error for review:

> I. The trial court erred in determining that it was in the best interest of H.A. to grant permanent custody to CCDCFS and terminate F.S.'s parental rights.

## II. Law and Analysis

{¶ 12} In his sole assignment of error, Father argues that the trial court's judgment granting permanent custody to CCDCFS and best interest determination were not supported by clear and convincing evidence.

### A. Standard of Review

{¶ 13} "Parents have a constitutionally protected interest in 'the care, custody, and management of their child[ren].'" *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 15, citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, that interest must "'always subject to the ultimate welfare of the child.'" *Id.*, quoting *In re B.L.*, 10th Dist. Franklin No. 04AP-1108, 2005-Ohio-1151, ¶ 7.

{¶ 14} A juvenile court's termination of parental rights and award of permanent custody to an agency shall not be reversed unless the judgment is not supported by clear and convincing evidence. *In re N.B.*, 8th Dist. Cuyahoga No.

101390, 2015-Ohio-314, ¶ 48. "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.*, 8th Dist. Cuyahoga No. 99931, 2014-Ohio-2051, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶ 15} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong of this statute, authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e). *Id.* "Only one of the factors must be present for the first prong of the permanent custody

analysis to be satisfied." *Id.*, citing *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 28.

{¶ 16} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the trial court must analyze whether, by clear and convincing evidence, it is in the best interest of the children to grant permanent custody to the agency pursuant to R.C. 2151.414(D). *Id.*, citing *In re L.W.*

## B. R.C. 2151.414(B) Factors

{¶ 17} Father does not contest the trial court's findings under R.C. 2151.414(B), and he concedes that the first prong of the permanent custody analysis is satisfied in this case.

{¶ 18} The trial court determined that the conditions set forth in R.C. 2151.414(B)(1)(a) and (d) were satisfied. The trial court's August 22, 2019 judgment entry granting permanent custody provides, in relevant part,

> The Court finds that: the child's mother is deceased, and father is currently incarcerated.
>
> The child had been in temporary custody of a public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two month period.
>
> * * *
>
> That one or more of the factors in division (E) of section 2151.414 of the Revised Code exist and the child cannot be placed with one of the child's parents within a reasonable period of time or should not be placed with either parent[.]

{¶ 19} Regarding the applicable R.C. 2151.414(E) factors, the trial court found that R.C. 2151.414(E)(1) applied, concluding that Father failed to remedy the

conditions that led to the child's removal. The trial court also found that "[Father] has been convicted of or pleaded guilty to an offense listed in [R.C.] 2151.414(E)(6) or [R.C.] 2151.414(E)(7)." As noted above, Father was convicted of kidnapping H.A. The offense of kidnapping, in violation of R.C. 2905.01, is listed as an offense under R.C. 2151.414(E)(6). Finally, the trial court found that R.C. 2151.414(E)(12) applied because Father was incarcerated at the time of the permanent custody trial and sentenced to a 25-year prison term in January 2018.

{¶ 20} After review, we find that the record clearly and convincingly supports the trial court's findings under R.C. 2151.414(B)(1). H.A. was committed to the predispositional temporary custody of the agency on November 10, 2016. The trial court granted temporary custody of H.A. to CCDCFS on May 16, 2017. At the time of the permanent custody hearings in April and August 2019, the child had been in the temporary custody of the agency for more than two years. It is undisputed that Father was convicted of kidnapping H.A., incarcerated at the time of the permanent custody hearings, and will not be able to care for H.A. based on the 25-year prison sentence he received in January 2018.

{¶ 21} Accordingly, we find that the first prong of the permanent custody analysis has been satisfied.

## C. Best Interest of the Child

{¶ 22} Father's challenge to the trial court's judgment pertains to the second R.C. 2151.414 prong. Father argues that the trial court erred in granting permanent custody to CCDCFS and determining that permanent custody was in H.A.'s best

interest. Father contends that legal custody to M.A.S. and H.J.A.J., rather than permanent custody to CCDCFS, was in the child's best interest.

{¶ 23} If the juvenile court determines that one of the factors listed in R.C. 2151.414(B)(1) applies, then the court must determine, by clear and convincing evidence, whether permanent custody is in the best interest of the child. *In re I.S.*, 8th Dist. Cuyahoga No. 107472, 2019-Ohio-638, ¶ 21, citing *In re E.C.*, 8th Dist. Cuyahoga No. 103968, 2016-Ohio-4870, ¶ 29.

{¶ 24} This court reviews a trial court's determination of a child's best interest under R.C. 2151.414(D) for an abuse of discretion. *In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 55 (8th Dist.), citing *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47. In this regard, "'[a] trial court's failure to base its decision on a consideration of the best interests of the child constitutes an abuse of discretion.'" *In re J.F.*, quoting *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, at ¶ 60.

{¶ 25} In determining the best interest of a child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates that the juvenile court consider all relevant factors, including the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services

agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 26} We note that "[t]he juvenile court has considerable discretion in weighing these factors." *In re K.P.*, 8th Dist. Cuyahoga No. 107577, 2019-Ohio-181, ¶ 36, citing *In re J.H.*, 8th Dist. Cuyahoga No. 105078, 2017-Ohio-7070, ¶ 53. Although the juvenile court is required to consider each factor listed in R.C. 2151.414(D)(1), no one factor is to be given greater weight than the others. *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Only one of the factors set forth in R.C. 2151.414(D)(1) needs to be resolved in favor of permanent custody. *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17. "A trial court's failure to base its decision on a consideration of the best interests of the child constitutes an abuse of discretion." *In re N.B.* at ¶ 60, citing *In re T.W.*, 8th Dist. Cuyahoga No. 85845, 2005-Ohio-5446, ¶ 27, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 574 N.E.2d 1055 (1991).

{¶ 27} To this end, "the best interest determination focuses on the child, and not the parent." *In re K.Z.*, 8th Dist. Cuyahoga No. 107269, 2019-Ohio-707, ¶ 85, citing *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 59. "A child's

best interests require permanency and a safe and secure environment." *In re Holyak*, 8th Dist. Cuyahoga No. 78890, 2001 Ohio App. LEXIS 3105 (July 12, 2001).

{¶ 28} In the instant matter, we find that the trial court considered the relevant statutory factors. The trial court's journal entries granting permanent custody of H.A. to the agency provides, in relevant part,

> Upon considering the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents; the wishes of the child; the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and, the report of the Guardian ad Litem, the Court finds by clear and convincing evidence that a grant of permanent custody is in the best interest of the child and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

> [CCDCFS] has made reasonable efforts to finalize the permanency plan for the child. These efforts were unsuccessful as father was arrested, convicted and incarcerated as to causing mother's death.

> The permanency plan for the child is reunification with the family.

> The Court finds that the child's continued residence in or return to the home of the father, [F.S.] will be contrary to the child's best interest.

> Therefore, it is in the best interest of the child to be placed in the permanent custody of [CCDCFS.]

{¶ 29} After reviewing the record, we find that the evidence supports the trial court's reliance on the factors set forth in R.C. 2151.414(D) and determination that permanent custody with the agency is in the best interest of the child.

{¶ 30} CCDCFS case worker Corey Carlo was assigned to the family's case from November 2016 to June 2017. At the time she received the case, Mother was missing, H.A. was in the care of Father, and there was an active protection order against Father that listed Mother and H.A. as protected persons. A case plan was developed for Father that included objectives for domestic violence. Father did not participate in domestic violence services or programming. Carlo testified about the behavioral issues that H.A. exhibited during her involvement in the case. H.A.'s behavioral issues included "frequent tantrums, difficulty sleeping, was not potty trained, very possessive, liked one-on-one attention and didn't get along with the other kids in the home [where H.A. was first placed]." (Tr. 17.) CCDCFS attempted to manage H.A.'s behavioral issues, and arranged for the child to participate in services with an "early-childhood mental health specialist who was working with [H.A.] to address those behaviors." (Tr. 19.)

{¶ 31} Subsequently, when he was in his third placement, H.A.'s behavioral issues included "frequent tantrums, difficulty getting along with the other children in the home, [and] difficulty sleeping." (Tr. 20.) H.A. also "became physically aggressive with the other children in the home." (Tr. 20.) CCDCFS attempted to manage H.A.'s behavioral issues by arranging for the child to participate in therapy through Ohio Mentor.

{¶ 32} Carlo testified that H.A. had two therapeutic service providers while she was assigned to the case. During her involvement in the case, Father did not identify M.A.S. and H.J.A.J. as interested individuals for placement or custody.

{¶ 33} CCDCFS case worker Dershawnia Ganous was assigned to the family's case on June 9, 2017. A case plan was developed for Father that included objectives for domestic violence and complying with the active no-contact order. She expected Father to comply with the protection order prohibiting Father from contacting H.A.

{¶ 34} When Ganous was assigned to the case, H.A. was in the foster home where he remained at the time of the permanent custody hearing. The foster family consists of foster mother, foster father, one biological son, and four other foster children. The child's foster family visits relatives and goes on "family outings" to sporting events, parks, etc. (Tr. 45.)

{¶ 35} Ganous testified that H.A. has "adjusted well" in the foster home. She explained, "[a]t first it was hard at the beginning, but [H.A.] has adjusted well now." (Tr. 45.) H.A. has behavioral issues. In the beginning, H.A. exhibited physical aggression towards children and adults, but the physical aggression has decreased since he has been in his current foster home. H.A. also has night terrors, which are decreasing, issues using the bathroom on his own, temper tantrums, and he is very attached to his foster mother. (Tr. 45-46.) H.A.'s behavioral issues are being addressed through weekly counseling sessions through Ohio Mentor. Ganous testified about CCDCFS's and the foster family's efforts to keep the child connected to the Arabic and Muslim cultures with which his parents identified. (Tr. 46-47.) Ganous testified that all of H.A.'s needs are being met in his foster home.

{¶ 36} Ganous asserted that the proposed legal custodians, M.A.S. and H.J.A.J., are Father's family friends and reside in Kentucky. (Tr. 52.) After Father

identified M.A.S. and H.J.A.J. as interested individuals and proposed legal custodians in December 2018, Ganous considered the possibility of placement with M.A.S. and H.J.A.J. She was unable to contact M.A.S. and H.J.A.J. because there was an issue with the phone number that had been provided to her. She explained that the phone number "was disconnected." (Tr. 52.) At the time of the permanent custody hearing, she had recently received a new phone number for M.A.S. and H.J.A.J.

{¶ 37} Ganous did not pursue an out-of-town investigation for M.A.S. and H.J.A.J. when Father provided their information in December 2018. She explained that she did not request an out-of-town investigation because "[H.A.] has a bond with the foster parents. He's been there for almost two years. He [doesn't] know the interested individuals in Kentucky, so I felt he needed contact to show that they can build a bond and communicate with the child due to them being strangers." (Tr. 53.) Ganous testified that to her knowledge, M.A.S. and H.J.A.J. did not have any contact with H.A. between the time the child was placed in the agency's temporary custody in November 2016 and the time that Father provided their information to the agency in December 2018.

{¶ 38} Ganous testified that during the time she was assigned to H.A.'s case, she learned that H.A. had phone contact with Father during a phone call between the child and his paternal grandparents. The contact between H.A. and Father was concerning to Ganous because the no-contact order prohibiting Father from contacting H.A. was active. (Tr. 57.)

{¶ 39} Ganous opined that permanent custody was in H.A.'s best interest:

I believe [permanent custody is] in [H.A.'s] best interest due to him having a bond with the foster family. He's been in the foster home for almost two years. It'll be two years on August 15th of [2019].

Due to father murdering his mother, father will be serving a 25-year prison sentence. [H.A.] is getting his basic and mental health needs met through the foster home.

(Tr. 58.)

{¶ 40} Ganous opined that granting legal custody of H.A. to M.A.S. and H.J.A.J. would not be in the child's best interest. She explained, that "[H.A.] doesn't really know those interested individuals in Kentucky, [Father's] family friends" and H.A. "doesn't know them and he does not have a bond with the family in Kentucky." (Tr. 58.)

{¶ 41} The child's GAL filed a report and recommendation on March 4, 2019. Therein, the GAL asserted that she conducted an investigation during which she interviewed the child, Ganous, H.A.'s foster parents, and a nurse and teacher at the child's school. The GAL asserted that H.A. has some mental health issues for which he takes medication and sees a therapist regularly. The GAL explained that H.A.'s mental health issues "appear to be linked to the loss of his mother. * * * It is the GAL's understanding that H.A. witnessed the mother being killed by the father."

{¶ 42} The GAL's report indicates that the child has adjusted "very well" to the foster home and is particularly attached to the foster mother. The GAL's report provides that the foster parents "would like to adopt H.A." Finally, regarding Father's family friends and proposed legal custodians, the GAL's report states that

they have not established any relationship with H.A., and they have neither visited nor spoken to the child on the phone since he was placed in the temporary custody of CCDCFS. The GAL concluded that granting permanent custody of H.A. to CCDCFS would be in the child's best interest.

{¶ 43} The GAL supplemented her written report and recommendation with an oral recommendation during the permanent custody hearing. The GAL made the same recommendation to the trial court, to grant permanent custody to CCDCFS. Although the GAL was impressed with the dedication of M.A.S. and H.J.A.J. in pursuing legal custody, the GAL did not believe that it was in the child's best interest to grant legal custody to M.A.S. and H.J.A.J. The GAL explained the basis for her recommendation:

> Considering [H.A.'s] mental health and behavioral issues as well as [the combined health issues of M.A.S. and H.J.A.J.], I'm not ever sure that [M.A.S. and H.J.A.J.] would be able to take care of [H.A.], especially on a prolonged basis because both of them is 60 years old, have multiple medical conditions, and [H.J.A.J. is] 65 years old and [H.J.A.J.] also has multiple medical conditions.

(Tr. 121.) The GAL ultimately concluded, "I believe that, unfortunately, there's no other recommendation but to give permanent custody of [H.A.] to [CCDCFS]." (Tr. 122.)

{¶ 44} As noted above, the evidence supports the trial court's reliance on the factors set forth in R.C. 2151.414(D) and determination that permanent custody with the agency is in the best interest of the child. First, regarding R.C. 2151.414(D)(1)(a), CCDCFS social worker Ganous testified at the permanent custody hearing that she

visited the child in the foster home where he had been residing for approximately two years, since August 2017. Ganous explained that either she or another agency social worker visited H.A. in the foster home at least once a month. Ganous also attended a cookout hosted by relatives of H.A.'s foster parents. Ganous testified that H.A.'s interactions with his foster family — including the foster parents, biological children of the foster parents, and the other foster children living in the home — were appropriate.

{¶ 45} Father argues that the trial court erred by permitting Ganous to testify about information she learned from the child's foster mother and that Ganous did not personally observe. Specifically, Father argues that Ganous's testimony regarding (1) the foster mother's relatives were helping H.A. learn the Arabic language, (2) foster mother took H.A. to a mosque; and (3) H.A. was having "night terrors" was inadmissible hearsay. The trial court permitted Ganous to testify about this information she learned from the foster mother over defense counsel's objection.

{¶ 46} The Rules of Evidence apply to permanent custody hearings. *See In re S.D.*, 8th Dist. Cuyahoga No. 97322, 2012-Ohio-2299, ¶ 50, citing Juv.R. 34. The trial court's broad discretion in admitting or excluding evidence, and absent an abuse of that discretion and a showing of material prejudice, the trial court's evidentiary ruling will be upheld. *In re J.T.*, 8th Dist. Cuyahoga Nos. 93240 and 93241, 2009-Ohio-6224, ¶ 67, citing *State v. Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985). The judge presiding over the permanent custody hearing is

presumed to be able to disregard improper testimony. *In re J.T.* at ¶ 70. As a result, in order to demonstrate prejudicial error, the party challenging the admission of the evidence must show that the judge relied on the improper evidence in making his or her decision. *Id.*, citing *In re Lucas*, 29 Ohio App.3d 165, 504 N.E.2d 472 (3d Dist.1985).

{¶ 47} In this case, Father has failed to demonstrate that the trial court relied on Ganous's purportedly improper testimony in granting permanent custody to CCDCFS. Even if the trial court did, in fact, err in admitting Ganous's testimony regarding the information she learned from H.A.'s foster parents, Ganous's testimony about her visits with H.A. in his foster home and H.A.'s interactions and interrelationships with his foster family constitute clear and convincing evidence supporting permanent custody.

{¶ 48} Regarding the child's interactions or interrelationship with Father, Father is prohibited from interacting with H.A. pursuant to the domestic violence protection order that remains effective until February 2021. The record reflects that Father violated this protection order on multiple occasions, including when Father contacted H.A. by phone.

{¶ 49} Regarding the child's interactions or interrelationship with M.A.S. and H.J.A.J., the trial court found that the child does not have a significant relationship with the proposed legal custodians. This finding is supported by the record.

{¶ 50} Father emphasizes that the fact that M.A.S. and H.J.A.J. made the six-hour drive from Kentucky to Cleveland for court proceedings demonstrates their willingness to care for H.A. Although we commend M.A.S. and H.J.A.J. for their willingness to be considered as legal custodians and their commitment in driving from Kentucky to Cleveland for court proceedings, this fact alone is not dispositive of H.A.'s best interest.

{¶ 51} Although M.A.S. and H.J.A.J. traveled to Cleveland for court proceedings, the record reflects that they were either unable or unwilling to travel to Cleveland to participate in visitation with H.A. M.A.S. testified that he was aware that the child had been removed from Father's custody and was in the custody of CCDCFS two years before the permanent custody trial. During these two years, M.A.S. did not visit the child in person, and spoke with the child one time on the phone. (Tr. 99, 108.) Because M.A.S. and H.J.A.J. did not travel to Cleveland to participate in visitation with H.A., CCDCFS was unable to observe the child's interactions with M.A.S. and H.J.A.J. or determine whether these interactions were appropriate.

{¶ 52} Second, regarding R.C. 2151.414(D)(1)(b), there was no direct evidence presented at trial about H.A.'s wishes. The child's GAL recommended that the trial court grant permanent custody of H.A. to CCDCFS.

{¶ 53} Third, regarding R.C. 2151.414(D)(1)(c), the record reflects that H.A. had been in the agency's custody for nearly three years at the time of the permanent custody hearing. CCDCFS was granted emergency predispositional temporary

custody of H.A. in November 2016, and permanent custody hearings were held in April and August 2019.

{¶ 54} Father argues that the child's custodial history with the agency weighs against granting permanent custody. Father emphasizes that H.A. was in four different placements between November 2016 and when he was placed with the foster family in July 2017. Father contends that the four different placements are indicative of a lack of stability while CCDCFS had custody of H.A. Father's argument is misplaced and unsupported by the record.

{¶ 55} As noted above, H.A. had been residing with his current foster family for two years at the time of the permanent custody hearings. Furthermore, two of the four placements were with Father's relatives or interested individuals identified by Father.

{¶ 56} Fourth, regarding R.C. 2151.414(D)(1)(d), the child's GAL testified that the child needs permanency and recommended granting permanent custody to CCDCFS. Father appears to argue that H.A.'s placement with his foster family is not a legally secure permanent placement because the foster parents do not plan to adopt H.A. Father also suggests that M.A.S. and H.J.A.J. could provide a legally secure permanent placement for H.A. because they are able to meet H.A.'s needs and they have successfully raised six children. Father's argument is misplaced and unsupported by the record.

{¶ 57} M.A.S. and H.J.A.J.'s willingness to care for the child does not alter what the trial court considered in determining whether to grant permanent custody

to CCDCFS and whether permanent custody was in H.A.'s best interest. *See In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 61, citing *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 11. If permanent custody to CCDCFS is in H.A.'s best interest, legal custody to M.A.S. and H.J.A.J. necessarily is not. *M.S.* at *id.*

{¶ 58} In denying Father's motion for legal custody to M.A.S. and H.J.A.J., the trial court concluded, in relevant part, "the proposed legal custodians reside out of state, do not have a significant relationship with the child, and are not related by blood or marriage; that their own children are all adults; that each has chronic medical issues." The record reflects that both M.A.S. and H.J.A.J. have chronic medical conditions for which they collect Supplemental Social Security Income. (Tr. 99-100.)

{¶ 59} As noted above, M.A.S. had been aware that H.A. was in CCDCFS's custody for approximately two years before the permanent custody hearings. M.A.S. testified that he was unable to travel to Cleveland sooner because of his chronic medical condition. (Tr. 99-100.)

{¶ 60} Finally, Father acknowledges that during the permanent custody hearings, "there was a concern about [Father] having residual [parental] rights[.]" Appellant's brief at 9. "[A]n award of legal custody does not divest parents of their residual parental rights, privileges, and responsibilities." *In re R.B.*, 2019-Ohio-1656, 136 N.E.3d 42, ¶ 75 (8th Dist.), citing *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 17.

{¶ 61} We recognize that Father is serving a 25-year prison sentence. Nevertheless, had the trial court awarded legal custody of H.A. to M.A.S. and H.J.A.J., rather than permanent custody to CCDCFS, Father's parental rights would not have not been terminated — he would retain residual parental rights and responsibilities and his right to regain custody in the future would not be permanently foreclosed. *See In re D.S.*, 8th Dist. Cuyahoga No. 106557, 2018-Ohio-3794, ¶ 19. As noted above, Father has demonstrated an inability to comply with the terms of the protection order and the prohibition of having any contact with H.A. This prohibition includes contacting H.A. via telephone that Father could conceivably attempt to do while he is incarcerated.

{¶ 62} Based on the foregoing analysis, we find that the record clearly and convincingly supports the trial court's findings under R.C. 2151.414(D) and determination that permanent custody is in H.A.'s best interest. The second prong of the permanent custody analysis has been satisfied.

{¶ 63} For all of the foregoing reasons, we overrule Father's sole assignment of error and affirm the trial court's judgment granting permanent custody to CCDCFS. The record reflects that the trial court considered the relevant statutory factors. We further find that the trial court's determination that permanent custody to CCDCFS is in the best interests of the child was supported by clear and convincing evidence and, as such, was not an abuse of discretion.

{¶ 64} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK D. CELEBREZZE, JR., JUDGE

PATRICIA ANN BLACKMON, P.J., and
ANITA LASTER MAYS, J., CONCUR